1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   BARING INDUSTRIES, INC.,

4                  Plaintiff,

5           v.                              19 cv 2829 (JGK)

6   3 BP PROPERTY OWNER LLC, et
    al.,
7
                   Defendants.
8
    ------------------------------x
9                                      New York, N.Y.
                                       July 13, 2020
10                                     2:30 p.m.

11  Before:

12                    HON. JOHN G. KOELTL,

13                                     District Judge

14                         APPEARANCES

15  ROSEN LAW LLC
         Attorneys for Plaintiff
16  BY:  JARED MICHAEL ROSEN
         GARY ROSEN
17
    SILLS CUMMIS & GROSS PC
18       Attorneys for Defendants
    BY:  MITCHELL D. HADDAD
19       KATHERINE MARGUERITE LIEB

20

21

22

23

24

25

```
 1              (Case called)

 2              THE COURT:  Good afternoon.  This is Judge Koeltl.

 3    This is a teleconference.

 4              Is the court reporter on the call?

 5              THE COURT REPORTER:  Yes, your Honor.  How are you?

 6              THE COURT:  I'm fine.  Good afternoon.  Thank you.

 7              Because we're keeping a transcript of this conference,

 8    no one else should be recording the conference.

 9              Mr. Alderson, call the case, please.

10              (Case called)

11              THE DEPUTY CLERK:  Could the parties state who they

12    are, starting with plaintiff's counsel.

13              MR. JARED ROSEN:  Jared Rosen and Gary Rosen for

14    plaintiff bearing industries.  Good afternoon, your Honor.

15              THE COURT:  Good afternoon.

16              MR. HADDAD:  Mitchell D. Haddad and Katherine Lieb for

17    the Defendant BP Property Owner LLC and Westchester Fire

18    Insurance Company.

19              Good afternoon, Judge.

20              THE COURT:  Good afternoon.  Hold on one second.

21    Remember to keep your voices up and state who you are so the

22    court reporter can get down the proper attributions.

23              This is a motion to dismiss.  I'm familiar with the

24    papers.  I'll listen to argument briefly.

25              So, for the defendants, what would you like to tell
```

1    me?

2         MR. HADDAD:  Mitchell Haddad speaking.  This is a

3    motion to dismiss the amended complaint's three claims against

4    3 BP Property Owner LLC, which is the owner of the building at

5    3 Bryant Park, and Westchester Fire Insurance Company, which is

6    the surety that posted a bond to bond the plaintiff's lien.

7         The first cause of action seeks to foreclosure a

8    mechanic's lien that's alleged against Dadong Catering and

9    Westchester Fire but not 3 BP.

10        The third cause of action is for unjust enrichment.

11   It's against Dadong and 3 BP but not Westchester Fire.  The

12   fourth cause of action is for quantum meruit against Dadong and

13   3 BP, again, not against Westchester Fire.

14        But all claims seek personal judgments against my

15   clients, 3 BP Property Owner and Westchester Fire, although

16   these claims are not alleged against both of them.

17        Baring's claims against 3 BP and Westchester Fire

18   should be dismissed, your Honor, because they fail to plead any

19   facts that state a plausible claim for relief on its face as

20   required by *Twombly* and *Iqbal*.  They should also be dismissed

21   because they fail to state a cause of action as a matter of

22   law.

23        Now, 3 BP Property Owner leased certain retail

24   premises to Dadong Catering LLC.  And up until when this motion

25   was made, Dadong in been in full and complete possession of the

1    premises pursuant to a lease.

2          Dadong operated a restaurant and made certain

3    leasehold improvements to build out its space, certain of which

4    were permanent and would remain with the landlord when the

5    lease was over.

6          But the lease doesn't specifically require Dadong to

7    make any specific improvements.  The landlord never required

8    them to make any specific improvements.  What the landlord did

9    agree in the lease is to provide what's called a tenant

10   improvement fund which would reimburse Dadong for some of the

11   leasehold improvements that it chose to make to build out for a

12   restaurant.

13         But the lease provides that Dadong would only be

14   entitled to reimbursement if it produced paid bills and

15   architect certificates and partial lien waivers for the

16   leasehold improvements to my client, 3 BP Property.

17         And the lease specifically precludes Dadong from using

18   any tenant improvements funds to purchase or install equipment,

19   trade fixtures, and personal property -- all of which had to be

20   removed at the end of the lease.

21         The lease does not mention Baring, the plaintiff, but

22   specifically required Dadong to hire Baring and specifically

23   authorized Baring to perform any services or provide materials

24   to Dadong's leased premises.

25         Now, the plaintiff filed a mechanic's lien against the

1    premises, and it's attached as Exhibit 1 I believe to the

2    opposition -- excuse me.  To my reply affirmation.

3            It states on its face that Baring was employed by

4    Dadong and it provided the work and materials to Dadong, and

5    those work and materials had to do with project management,

6    coordination, and installation of food service equipment --

7    ranges, hoods, walk-in refrigerators, your Honor.

8            They also attach a copy of an AIA standard contract,

9    which was Exhibit 1 to the opposition affirmation of Mr. Jared

10   Rosen.  It's an AIA contract for furnitures, furnishings, and

11   equipment, not for permanent improvements.

12           THE COURT:  But could I just stop you.

13           How could I determine on the basis of a motion to

14   dismiss whether any of the improvements for which reimbursement

15   is being sought from the owner, which is a relatively small

16   part, somewhere in excess of $300,000, compared to the total

17   amount of the services and equipment that Baring provided?

18           So of the $300,000 that was being sought and for which

19   a lien was imposed on the property, how could I determine just

20   on the basis of the pleading that none of that was a permanent

21   improvement which was required to be left on the premises and

22   become part of the property as opposed to the personal property

23   that had to be removed at the end of the lease?

24           MR. HADDAD:  Well, Judge, you're hitting on the

25   argument I believe that Baring is making having to do with the

consent issue.

And their argument here is that the lease provided the consent, which is an essential element, an owner's consent if you will, which is an essential element of the claim. I'm not asking you at this point to dismiss because it's not a permanent improvement. That will happen later on in the case, if the case proceeds.

For reasons that I won't get into, most significant of which is that there was an auction of all the property. People brought it to 100 some odd thousand dollars and then taking everything out. It's movable. So it will be an empty space, other than what's physically attached to the walls.

Getting to the issue here, Judge, is the complaint's failure to completely allege that my client, 3 BP Property Owner, as an owner of real property consented to the improvements that may have been performed by Baring to my client's tenant.

Now, clearly Westchester Fire Insurance Company is a bonding company. They had nothing to do with the property. They had nothing to do with this lien. They had nothing to do with the lease. All they are is a bonding company.

THE COURT: Yes, but they stand in the shoes of the owner of the property having put up the surety bond.

MR. HADDAD: Actually, Judge, with respect, all they did to guarantee the judgment that this Court may render on the

1  first cause of action which was only for the lien.  They cannot

2  be liable for unjust enrichment.

3          THE COURT:  That's fine.  You can put those aside.

4          MR. HADDAD:  It is only a judgment.  And the judgment

5  is only limited by what the Lien Law allows.

6          THE COURT:  Yes.  But that means they don't get

7  dismissed on Count One.

8          MR. HADDAD:  Well, Judge, I think they do for this

9  reason.  You'll recall that the original complaint contained

10  not a single allegation about the owner, 3 BP, consenting to

11  any of the work Baring originally performed.

12          So your Honor granted them leave to replead.  And the

13  first amendment of amended complaint conclusory asserted that

14  "Owner consented to various work" without saying what it did,

15  how it did, or putting any meat on those bones so to speak.

16  And the Court again permitted Baring to replead.

17          Now what the second complaint attempts to do is

18  satisfy the huge hole in its case by alleging the elements of

19  owner's consent in every conceivable way possible through a

20  series of jumbled, conclusory, confusing, and contradictory

21  allegations.

22          THE COURT:  Hold on.  Among other things, they say

23  that the lease to Dadong hadn't been provided to them and they

24  only got it through the state court litigation.  So they

25  couldn't have pleaded it earlier, and now they do.

1      MR. HADDAD:  Those allegations in the present

2  complaint, paragraphs 35, 46, and 49 -- those allegations were

3  made without ever seeing the lease.  Number two, there is no

4  basis for those allegations.  That's complete made-up fiction.

5      Number three, Judge, my client is under no obligation

6  to give it to them, and they have never even asked me for a

7  copy of the lease.

8      Getting to the lease, if you will, if you want to go

9  there -- I wanted to walk through the allegations in the second

10  amended complaint to show you that they're completely bereft of

11  statutory language and case law language that is needed to show

12  that my client, 3 BP, was an affirmative factor in procuring

13  the improvement to be made, for having possession and control

14  of the premises, assent to the improvement and the expectation

15  that he or she will receive the benefit of it.

16      So the second part of that test, Dadong must have

17  complete possession and control.  It was a lease.  It was a

18  conveyance.  They had exclusive possession and control until my

19  client evicted them following the making of this motion.

20      With respect to procuring being an affirmative factor,

21  paragraph 25 of the amended complaint says:  "Owner was an

22  affirmative factor in procuring the work."  It doesn't say how.

23  It doesn't say what it did.

24      Paragraph 26:  "owner was in possession and control

25  with Dadong's leased premises."  That's contrary to the lease.

1   It provides that Dadong was in exclusive control.

2          Paragraph 27:  "Owner consented to Baring's work."  It

3   doesn't say how.  It doesn't say what it did.

4          Paragraph 32:  "Owner consented to the improvements

5   made by Baring in accordance with Lien Law Section 3."  That's

6   just parroting the statute, again, a conclusion.

7          Paragraph 28.

8          THE COURT:  Okay.  I am familiar with the papers.

9          MR. HADDAD:  Let's talk about the lease base documents

10  23406789 we know that 3 BP Property Owner had no dealings with

11  Baring.  It didn't contract with Baring.  It never paid for it.

12  It never approved anything.  It never received or stored any of

13  the goods.  Everything was between Dadong and Baring.

14          Now, there is nothing in the lease that required

15  Dadong to hire Baring or perform the specific work.  It's not

16  enough, Judge, as we cite in our papers, for a lease to

17  acknowledge or consent to general work to be done by tenant.

18          The lease must specifically require the tenant to

19  perform the specific work that Baring here performed, or the

20  landlord itself must be actively engaged with the tenant in the

21  performance of work, such as in one case the landlord actually

22  helped the tenant install electric work.

23          Now, the consent contemplated by the statute is not a

24  consent given to the tenant but a consent given to the

25  materialmen.  There is nothing in the lease from which it

1   explicitly or implied any consent from the owner, 3 BP, to

2   Baring to perform any work.

3          Baring has failed to identify any lease provision in

4   which the landlord specifically required Dadong to do anything

5   that Baring may have done.  There is no lease provision in

6   which 3 BP expressly consented to the specific work Baring

7   allegedly performed.

8          There is one case that we've cited, Judge, where if

9   they do work to install a boiler, then they're not liable for

10  leave to install electricity.

11         If you go through paragraph 3.03, which is where they

12  hang their hat on, all that basically provides, your Honor, is

13  that there's something called tenant's initial work.

14         And in tenant's initial work, there is going to be a

15  $1.8 million allowance.  And for the tenants to recover the

16  allowance as provided in Section 3.04, it's got to get paid

17  invoices, a certificate signed by tenant's architect, and

18  partial lien waivers.

19         There is nothing in this complaint, your Honor, that

20  says that Baring provided any partial lien waivers.  Actually

21  if you look at their AIA contract, Dadong is required to pay

22  Baring just upon presentation of their bill.

23         THE COURT:  Excuse me, counsel.

24         How do I know that given the explicit provision in the

25  lease, which provides for the owner to pay for those

 1 | improvements, the specific improvements for which relief is

 2 | being sought in Count One are not within those improvements?

 3 |       I don't understand why that's not the subject for

 4 | discovery.  You tell me that there are other dispositive issues

 5 | that will dispose of this case subsequently.  Okay.  I guess

 6 | that's on a motion for summary judgment.

 7 |       But I still don't understand why there aren't

 8 | sufficient allegations in the complaint with respect to the

 9 | issue of owner consent to survive a motion to dismiss.

10 |       MR. HADDAD:  Your Honor, the plaintiff cited a case in

11 | their brief.  It's called *Rice v. Culver*.  It's a Court of

12 | Appeals case.  It's from 1902.  They cite it there at the end

13 | of their reference to the *Ferrara* case.

14 |       *Ferrara* absolutely supports dismissal, but let me just

15 | tell you about *Rice*.  In *Rice*, there was a landlord, an owner

16 | of a property, who entered into a lease with the tenant, and

17 | the tenant went and hired a third party to perform some work

18 | under the lease.

19 |       And the trial court held it was because of the fact

20 | that the tenant was required to perform work under the lease,

21 | that doesn't evidence the affirmative factor of consent as

22 | required by Lien Law 3.  The appellate division reversed and

23 | reinstated the trial court's judgment.

24 |       And the state Court of Appeals reversed the appellate

25 | division, reinstated the trial court's judgment dismissing the

1    complaint, and it basically said that just because the tenant

2    was empowered to make improvements to its leased premises, that

3    per se does not constitute the consent requirement for the

4    purposes of Lien Law 3.

5         THE COURT:  And then the Court of Appeals

6    distinguished *Rice* and *Ferrara* and said *Rice* was being read too

7    broadly.

8         MR. HADDAD:  I'm not aware of that case, your Honor.

9         THE COURT:  *Ferrara*.  It's the case you just cited.

10   You read *Rice*, and then the Court of Appeals distinguished *Rice*

11   and *Ferrara*.

12        MR. HADDAD:  Yes.  Because, your Honor, in *Ferrara*,

13   the lease expressly required the electrical work that was

14   plaintiff's former lien and required the landlord to retain

15   close supervision over the work and authorized it to exercise

16   some discretion and direction over the work by reviewing,

17   commenting on, revising, and granting ultimate approval for the

18   specific electrical work.

19        There's nothing here where that's alleged that 3 BP

20   did any of this.  I agree, your Honor.  If the landlord, the

21   owner, is involved with the work itself, a lien can be filed

22   because that should constitute owner's consent.  But there is

23   nothing here that gives privity.

24        THE COURT:  Okay.  All right.  Let me listen to the

25   plaintiff.

1          MR. JARED ROSEN:  Good afternoon, your Honor.  This is

2     Jared Rosen for the plaintiff.

3          THE COURT:  Is that better?

4          MR. JARED ROSEN:  Yes.  This is Jared Rosen for the

5     plaintiff.

6          The plaintiff's position is that your Honor is correct

7     to determine in that the issues that counsel has been raising

8     about the specific items of work that were provided, that that

9     is something that is not to be determined in the instant motion

10    to dismiss.  It is more appropriate for a motion for summary

11    judgment.

12         From the plaintiff's perspective, they should be

13    provided with the opportunity to take discovery on everything

14    that has been brought to the Court's attention thus far in the

15    motion papers, including the lease, the sections of the lease

16    that the plaintiff believes give the owners consent for the

17    work to be provided by the plaintiff to the tenant, and also to

18    the actual permanent improvements to the property and whether

19    or not the improvements that were provided or that plaintiff

20    performed were all permanent improvements or otherwise just

21    improvements counsel is stating might affect the amount of the

22    lien.  But it's the plaintiff's position that they're all

23    permanent improvements because everything was provided and

24    attached to the premises themselves.

25         The second amended complaint was specific as far as

 1   what the plaintiff had in its possession at the time, and that

 2   is that everything that the plaintiff had done -- they were

 3   hired by the tenant.  They were hired by the tenant with the

 4   landlord's consent and knowledge.

 5        It is correct that we did not have the lease until

 6   after the second amended complaint was filed at the end of

 7   September of 2019.  That was because there were cases that as

 8   we've stated in our opposition papers -- for example, the

 9   landlord filed their -- they actually commenced their action

10   against the guarantors on the lease only on October 11, 2019.

11        That was about two weeks after the second amended

12   complaint was filed, and it was over a month after our

13   September 4 premotion conference where we discussed these

14   issues before your Honor and requested permission to file a

15   second amended complaint.

16        But the paragraphs that are obtained that counsel was

17   citing before -- I'm not going to specifically cite each

18   paragraph because Mr. Haddad did earlier.  But the paragraphs,

19   even just between paragraphs 24 to 39 of the second amended

20   complaint, they do sufficiently allege that the owner

21   consented; that the consent was provided in the lease; that it

22   can be inferred.  But it actually is provided in the lease

23   between the landlord and the tenant for work to be performed.

24        It's the plaintiff's position that the three causes of

25   action that Mr. Haddad is moving to dismiss herein -- that they

1    should survive this and that the motion should be denied in its

2    entirety because the plaintiffs did allege as much as is

3    required under the standard for pleading these three causes of

4    action.

5          And I want to note also on the second and third causes

6    of action for unjust enrichment and quantum meruit, the

7    defendants' reply cites that the plaintiffs -- that we failed

8    to address those two causes of action.

9          And because of that, they state that the two unjust

10   enrichment and quantum meruit causes of action should be deemed

11   to have been abandoned.  But I believe that for some reason,

12   the pages 12 to 15 of my declaration in -- excuse me -- the

13   memorandum in response to the motion to dismiss actually goes

14   directly towards opposing those portions of the motion to

15   dismiss on the unjust enrichment and quantum meruit claims.

16         So they're certainly not abandoned.  And it's

17   respectfully submitted that the two causes of action for unjust

18   enrichment and quantum meruit should stand as well for the

19   reasons contained in the papers that we submitted in opposition

20   which we do cite case law towards.

21         THE COURT:  Why aren't those quasi-contract claims

22   barred by the existence of the contract between Dadong and

23   Baring?  Baring agreed to perform the work in accordance with

24   its contract with Dadong.  So there is a contract directly on

25   point that covers the services.

1          The normal rule is if there is a contract directly on

2    point which covers the work, then you can't plead quasi

3    contract, either unjust enrichment or quantum meruit.

4          Why doesn't that principle bar the quasi-contract

5    claims?

6          MR. JARED ROSEN:  Our argument is that the contract

7    between plaintiff and Defendant Dadong -- it did not

8    specifically in the AIA contract contain an agreement between,

9    as your Honor can tell by both of us, both sides claiming, that

10   the contract itself was not between the plaintiff and the

11   defendant/owner/landlord.

12         THE COURT:  That's right.  It was with a third party,

13   a third party as to the owner.  It was between Dadong and

14   Baring.

15         MR. JARED ROSEN:  Correct.

16         THE COURT:  But it was a contract to provide work and

17   to pay for the work, which you now seek by a quasi-contract

18   claim, unjust enrichment, or quantum meruit.  Even though the

19   contract was with a third party, the cases appear to be clear

20   that you can't have a quasi-contract claim when there is a

21   contract directly on point for the same subject matter.

22         The damages that you seek are exactly the same as they

23   would be for a claim to enforce the contract.  So because

24   there's a contract, you can't sue in quasi contract.

25         Now, there are exceptions.  If the contract is

 1  allegedly defective or if the existence of the contract is

 2  somehow disputed, but none of that's true.

 3         There's a contract directly on point that provides the

 4  services to be provided and payment to be made.  The party

 5  providing the services can't then sue in quasi contract simply

 6  because the contract was entered into which third putter.

 7         You haven't given me any cases, so as far as I can

 8  tell, that say that basic principle is just not true.

 9         MR. JARED ROSEN:  The argument is the landlord,

10  inasmuch as they're claiming that portions of the contract

11  would not be applicable for various reasons they have given,

12  including but not limited to certain parts of it not being

13  permanent improvement --

14         THE COURT:  No.  No.  You're talking about the lease.

15  The issue is not with respect to the quasi-contract claims, the

16  lease.  The issue is obviously there was a contract between

17  Baring and Dadong in which Baring provided the services and

18  improvements in return for receiving payment from Dadong.  So

19  there's a contract directly on point that Baring has or had

20  with Dadong.

21         It then can't say, well, I'm going to forget about

22  that contract and sue for the value of the services that I

23  provided.  It had a contract.  It can sue on the contract.  It

24  probably is suing on the contract for the services that it

25  provided to Dadong.

1              It can't then turn around and say, well, I'm going to

2     sue as if there were no contract.  There is and was a contract

3     for exactly the same services for which it now seeks

4     reimbursement under quasi contract.

5              MR. JARED ROSEN:  Yes.  That's correct.

6              THE COURT:  Why aren't the claims for quasi contract

7     therefore barred?

8              MR. JARED ROSEN:  It's our position, notwithstanding

9     the law that counsel cited and that your Honor just provided,

10    that the landlord benefited from the services that were

11    provided.

12             And in the event that those do not overlap with what's

13    in the AIA contract, that those portions of work that might

14    have been provided that were not specifically contained in the

15    AIA contract, that in that case, plaintiff should have the

16    right to recover against the landlord under the quasi contract

17    causes of action.

18             Inasmuch as the plaintiff provided all of the work

19    that was contemplated in the AIA contract and they're pursuing

20    that against Dadong which was secured by the lien which has

21    been bonded and discharged, then your Honor is correct.

22             THE COURT:  Okay.

23             MR. JARED ROSEN:  I just wanted to get back because

24    Mr. Haddad mentioned that Dadong was the party that was in

25    possession of the actual premises from the time that their

1    lease took place.

2            But we attached an exhibit, I believe just one of

3    several documents that exist, which, for example, I believe

4    this is Exhibit 8 on the opposition, which was a form submitted

5    to the New York City Department of Buildings.  This was

6    actually submitted after the lease was already signed, several

7    months after the lease was already executed.

8            It specifically says the owner of the property, 3 BP

9    Property Owner needed to put down the name of the property

10   owner and have signatures that were filed with the city.

11           So the plaintiff's position is that the landlord was

12   aware of the work that the plaintiff was doing for the tenant

13   and that they were specifically doing the work for the tenant

14   because the landlord entered into the lease with the tenant

15   improvement allowance so that the tenant can actually build out

16   the premises to their specifications so they can actually

17   perform on the lease and have an operational restaurant and I

18   believe operate that restaurants for many years.

19           That's the only reason why the plaintiffs were even in

20   position to provide all the work that they did.  So for all

21   those reasons, we respectfully request that the motion be

22   denied so that we can move forward and exchange on both sides

23   discovery demands and ultimately take depositions so that we

24   can narrow the issues further and hopefully come to an ultimate

25   resolution of the case.

1          THE COURT:  Okay.  Thank you.

2          MR. HADDAD:  Your Honor, may I just reply?

3          THE COURT:  Briefly, yes.

4          MR. HADDAD:  Mitchell Haddad here.

5          The crux of the plaintiff's argument is that the

6    landlord was aware of the work by tenant and that Baring did

7    the work for tenant so that tenant could perform under the

8    lease.

9          That argument has squarely been rejected by three

10   courts, all of which are cited in my papers.  In the *Interior*

11   *Buildings* case, which is cited on page 4 of my reply, the lease

12   provided for a tenant improvement allowance for the tenant to

13   perform improvements.  The tenant hired a third party.  Held

14   that was not the consent required for the purposes of Lien Law

15   3.

16         The *Paul Mock* case where the landlord consented

17   specifically to a tenant's request to perform improvements.

18   And the court, the First Department, held in 1982 that the

19   owner's consent was required by the lease and it was sought by

20   the tenant to avoid a forfeiture of the lease.  That does not

21   constitute the required consent.

22         In the *Creech* case decided by the Third Department in

23   2012, C-r-e-e-c-h, had to do with an owner had to sign certain

24   governmental approvals for contract vendees to perform certain

25   work.  The third party performed the work for the contract

1    vendees.

2          The Third Department held that that consent in signing

3    the approvals, which they refer to as Exhibit 8, does not

4    constitute the consent for the purposes of the Lien Law.  I

5    also note in Exhibit 8 the name of the architect is not the

6    plaintiff's architect.  They didn't have an architect.

7          Two other points:  One is discovery, your Honor.

8    Discovery is not to be used as a fishing expedition that

9    creates a cause of action where none exists.  They've had three

10   opportunities to plead the consent requirement.  And the real

11   issue here, Judge, it's a how.  It's a who, what, when, and

12   how.

13         And this complaint is completely devoid of showing

14   what the landlord did, other than by signing the lease that

15   generally permits the tenant to perform certain build-outs and

16   it would give him a tenant improvement credit -- how that

17   constitutes an express consent to a third party Baring for

18   Baring to perform this work.  That is the crux of the case,

19   Judge, and there is nothing in this complaint that satisfies

20   that.

21         I thank you very, very much for hearing us.  Thank

22   you.

23         THE COURT:  For sure.  No problem.  I am ready to

24   decide.

25         As I said, I'm familiar with the papers.  I've

1   listened to the arguments.  And I'm prepared to decide the

2   motion.

3          The remaining defendants in this case, 3 BP Property

4   Owner LLC, otherwise known as "3 BP Property" and Westchester

5   Fire Insurance Company, otherwise known as "Westchester Fire",

6   move pursuant to Federal Rule of Civil Procedure 12(b)(6) to

7   dismiss the plaintiff's first claim in the second amended

8   complaint against Westchester Fire to foreclose on a mechanic's

9   lien and for judgment on a bond; the third claim in the second

10  amended complaint for unjust enrichment; and the fourth claim

11  in the second amended complaint for quantum meruit.

12         The standard for deciding a motion to dismiss pursuant

13  to Rule 12(b)(6) is well-established.  See Ashcroft v. Iqbal,

14  556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S.

15  544, 570 (2007).

16         In deciding a motion to dismiss pursuant to Rule

17  12(b)(6), the allegations in the complaint are accepted as

18  true, and all reasonable inferences must be drawn in the

19  plaintiff's favor.  See McCarthy v. Dun & Bradstreet Corp., 482

20  F.3d 184, 191 (2d Cir. 2007).

21         The Court's function on a motion to dismiss is "not to

22  weigh the evidence that might be presented at trial but merely

23  to determine whether the complaint itself is legally

24  sufficient."  Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir.

25  1985).

1          The following allegations taken from the second

2     amended complaint and documents incorporated by reference in

3     the second amended complaint are accepted as true for purposes

4     of this motion to dismiss.

5          3 BP Property is the owner of premises at 3 Bryant

6     Park, also known as 1095 Avenue of the Americas, and 126-128 W.

7     42nd Street, New York, New York, otherwise known as the

8     "premises."  Second amended complaint paragraphs 12-13.

9          3 BP Property was the landlord to Dadong Catering LLC,

10    which occupied the premises as the tenant.  Dadong has not

11    appeared in this action and had a default entered against it on

12    May 30, 2019.  Dadong filed for Chapter 11 bankruptcy on

13    November 13, 2019.  ECF No. 83.

14         3 BP Property and Dadong entered into a lease

15    agreement for Dadong to lease the premises, and as part of the

16    lease agreement Dadong was allegedly required to undertake

17    construction, renovations, and improvements to the premises.

18    Second amended complaint, paragraphs 23 to 25.

19         3 BP Property allegedly knew and consented to Dadong's

20    engaging the services of contractors, subcontractors,

21    suppliers, and other materialmen to perform work at the

22    premises.  Id. at paragraphs 27 to 29.

23         At all relevant times, 3 BP Property allegedly had

24    possession and control of the premises and assented to

25    improvements to the premises allegedly because 3 BP Property

1    expected that any improvements would accrue to the benefit,

2    either directly or indirectly, of 3 BP Property as the owner of

3    the premises.  Id. at paragraph 26.

4              The lease agreement between the landlord, 3 BP

5    Property, and the tenant, Dadong, the specifics of which only

6    came to light in this litigation after the plaintiff filed the

7    second amended complaint as a result of discovery in a separate

8    state court action brought by 3 BP Property against Dadong's

9    guarantors, provides that the "Landlord shall pay to tenant an

10   allowance up to the amount of $1,825,000.00, which amount shall

11   be paid to tenant for the cost and expense incurred by tenant

12   for the actual construction performed in connection with

13   tenant's initial alterations in the premises . . . and for so

14   called 'soft costs', including, without limitation,

15   architectural and engineering fees in connection with tenant's

16   initial work performed within two years . . . provided,

17   however, that no portion of the allowance may be applied

18   towards the cost of portable equipment, furniture, or other

19   items of personal property of tenant."  Rosen Decl. Ex. 2, §

20   3.03.

21             The lease agreement defines "Tenant's Property" as

22   "all tenant's business and trade fixtures, equipment, movable

23   partitions, furniture, merchandise and other personal property

24   within the premises . . ." Id. § 14, and provides that "at the

25   termination of this lease or tenant's right of possession . . .

1    tenant shall remove . . . tenant's property from the premises .

2    . ." Id. § 24.

3         The lease provides that "all improvements in and to

4    the premises made by tenant other than tenant's property or

5    except as may be otherwise expressly set forth herein,

6    including, any alterations (collectively, leasehold

7    improvements," shall remain upon the premises at the end of the

8    term without compensation to tenant."  Id. § 8.01

9         Dadong allegedly contracted with the plaintiff, Baring

10   Industries, Inc., on May 15, 2017 to make a number of

11   improvements to the premises, including but not limited to, the

12   installation of ranges, hoods, and walk-in refrigerators on the

13   premises.  Id. at paragraphs 38(a)-(w), 63.

14        The total value of the contract for work, labor,

15   services, and equipment that the plaintiff performed and

16   installed on the premises was $2,147,039.41.  Baring alleges

17   that it fully performed under its agreement with Dadong by

18   providing labor and furnishing materials on the premises from

19   approximately May 15, 2017 to July 18, 2018.  Id. at paragraphs

20   57, 69.

21        The plaintiff alleges that out of the original

22   $2,147,039.41 owed to the plaintiff, the plaintiff is now owed

23   $320,356.94 for the unpaid portion of the contract representing

24   labor, services, and materials expended by the plaintiff.  Id.

25   at paragraphs 42-43.

1          On February 15, 2019, the plaintiff filed a notice

2     under the Mechanic's Lien Law in the Office of the New York

3     County Clerk in the amount of $320,356.94 against the premises

4     to secure the plaintiff's entitlement for services performed by

5     the plaintiff on the premises.  Id. at paragraph 18.

6          The Lien Law notice specified that the work and labor

7     performed was "for the installation of foodservice equipment,

8     including, but not limited to, ranges, hoods, walk-in

9     refrigeration, project management, and coordination, etc."

10     Haddad Affirm Ex. A.

11          On May 22, 2019, 3 BP Property, as principal, and

12     Westchester Fire, as surety, bound themselves, jointly and

13     severally, under a surety bond in the penal sum of $352,392.63

14     in order to discharge the mechanic's lien held by the plaintiff

15     against the premises.  Id. at paragraph 44.

16          As relevant to this motion, the plaintiff has brought

17     one claim against Westchester Fire to foreclose the mechanic's

18     lien and for judgment on the bond under the New York Lien Law;

19     one claim for unjust enrichment against Westchester Fire and 3

20     BP Property; and one claim for quantum meruit against

21     Westchester Fire and 3 BP property.

22          In this case, the surety, Westchester Fire,

23     substituted the bond for the lien.  And thus, whether

24     Westchester Fire is liable on the bond turns on the question

25     whether the plaintiff has alleged sufficiently that it could

1    foreclose on the mechanic's lien in which 3 BP Property is

2    named.  See Morse/Diesel, Inc. v. Trinity Indus., Inc., 67 F.3d

3    435, 445 (2d Cir. 1995) "Liability as a surety depends on the

4    liability of its principal . . . ."

5         Under the New York Lien Law, "a contractor,

6    subcontractor, laborer, or materialmen . . . who performs labor

7    or furnishes materials for the improvement of real property

8    with the consent or at the request of the owner thereof, or of

9    his agent, contractor, or subcontractor, . . . shall have a

10   lien for the principal and interest, of the value, or the

11   agreed price, of such labor, including benefits and wage

12   supplements due or payable for the benefit of any laborer or

13   materials upon the real property improved or to be improved and

14   upon such improvement, from the time of filing a notice of such

15   lien as prescribed in this chapter."  N.Y. Lien Law § 3.

16        "To enforce a lien under Lien Law § 3, a contractor

17   performing work for a tenant need not have any direct

18   relationship with the property owner."  Ferrara v. Peaches Café

19   LLC, 115 N.E.3d 621, 624 (N.Y. 2018).

20        Rather "to fall within that provision, the owner must

21   either be an affirmative factor in procuring the improvement to

22   be made or, having possession and control of the premises,

23   assent to the improvement in the expectation that he will reap

24   the benefit of it."  Id. quoting Rice v. Culver, 64 N.E. 761,

25   762-63 (N.Y. 1902).

1          In cases "in which the tenant covenanted by the lease

2   to erect buildings or make improvements . . . the estate of the

3   landlord was properly held liable, because not only did he

4   require the improvement to be made, but the improvement inured

5   to his benefit, either because it reverted to him at the

6   expiration of the demised term, or because his rent proceeded

7   from its use."  Rice, 64 N.E. at 763 (internal citations

8   omitted).

9          The New York Lien Law requires the landlord to make

10  some "affirmative act" in order for courts to find that the

11  landlord consented to the improvements, but the 'affirmative

12  act' can include lease terms requiring specific improvements to

13  the property."  Ferrara, 115 N.E.3d at 626.

14          "When a lease does not require improvement, the

15  owner's overall course of conduct and the nature of the

16  relationship between the owner and the lienor may demonstrate

17  consent for purposes of Lien Law § 3."  Id.  Consistent with

18  the purposes of the law, the law "is to be construed liberally

19  to secure the beneficial interests and purposes thereof."  Id.

20  at 624.

21          The plaintiff has alleged sufficiently that 3 BP

22  Property was an "affirmative factor" in procuring the permanent

23  improvements, whatever they were, that the plaintiff made to

24  the premises by pointing to the terms of the lease between

25  Dadong and 3 BP Property.

1        It is reasonably clear from the terms of the lease

2   between 3 BP Property and Dadong, particularly Section 3.03 of

3   the lease, that 3 BP Property expressly contemplated that

4   Dadong would make improvements to the premises.

5        Section 3.03 went beyond mere "authorization" that

6   Dadong be allowed to make repairs and nonspecific alterations.

7   See M&B Plumbing & Heating Co., Inc. v. Cammarota, 477 N.Y.S.2d

8   901, 902 (App. Div. 1984).

9        Section 3.03 stated that the "Landlord shall pay to

10  tenant an allowance up to the amount of $1,825,000.00, which

11  amount shall be paid to tenant for the cost and expense

12  incurred by tenant for the actual construction performed in

13  connection with tenant's initial alterations in the premises."

14       The use of the word "shall" and the setting aside of a

15  fixed sum of money, $1,825,000.00, for the "actual construction

16  performed" indicate that 3 BP Property was not merely

17  authorizing but actively consenting to improvements to the

18  premises.

19       Moreover, Section 3.03's use of the phrase "Initial

20  Work" and the fact that only improvements made within two years

21  of the lease agreement suggests that 3 BP Property contemplated

22  a set of specific permanent improvements that Dadong would make

23  when Dadong first became a leaseholder within a fixed time

24  period in order to make the premises initially operational for

25  Dadong.  See id. finding a landlord had consented within the

1    meaning of the Lien Law where the vendee certified that it

2    would make improvements to the premises within one year.

3          It seems reasonably clear that the parties "were well

4    aware of the intended use of the property as a" commercial

5    kitchen, and "it can be inferred that improvements furthering

6    that purpose were within the parties' contemplation . . . ."

7    Id. at 903.

8          Further, by carving out the "Tenant's Property" from

9    the coverage of the allowance to be paid to Dadong to undertake

10   improvements, which property other parts of the lease required

11   Dadong to remove at the end of the lease, 3 BP Property was

12   effectively acknowledging that it would have a reversionary

13   interest in the permanent improvements undertaken by Dadong and

14   that such improvements would inure to the benefit of 3 BP

15   Property.  See id. finding consent where the lease terms did

16   more than authorize repairs and nonspecific alterations that

17   would "add nothing of value to the vendor's contingent

18   reversionary interest."

19         Section 8.01 of the lease, which stated that "all

20   improvements in and to the premises made by tenant, other than

21   tenant's property or except as may be otherwise expressly set

22   forth herein, including any alterations collectively,

23   "Leasehold Improvements," shall remain upon the Premises at the

24   end of the term without compensation to tenant."

25         Expressly contemplated that certain improvements made

 1    by Dadong would inure to the benefit of 3 BP Property was

 2    specifically provided for in Section 8.01 of the lease.

 3            Thus, contrary to the defendants' contention, the fact

 4    that there is a distinction drawn throughout the lease between

 5    leasehold improvements and trade fixtures implies that 3 BP

 6    Property did give consent by the terms of the lease that Dadong

 7    undertake certain improvements that would then remain on the

 8    premises following the termination of the lease and that would

 9    be excluded from the property that Dadong had a contractual

10    obligation to remove at the end of the lease.

11            The lease establishes that 3 BP Property consented to

12    some kinds of permanent improvements to the premises based on

13    the fact that the lease contemplated that Dadong would

14    undertake initial work that would eventually inure to the

15    benefit of 3 BP Property following termination of the lease.

16            What is unclear from the second amended complaint and

17    the papers submitted on this motion to dismiss is what is the

18    precise nature of the unpaid labor, services, and equipment

19    costs that are the subject of the mechanic's lien and whether

20    all the improvements made that are subject to the unpaid

21    portion of the contract between the plaintiff and Dadong are

22    rightly classified as "Leasehold Improvements" under the term

23    of the lease.

24            Whether the unpaid money allegedly owed to the

25    plaintiff was for work done for permanent improvements, within

1   the meaning of the Lien Law and the lease agreement or,

2   instead, for property that would be removable by Dadong at the

3   end of the lease, could not be decided on the current papers.

4   See Murname Bldg. Contractors, LLC v. Cameron Hill Constr.,

5   LLC, 73 N.Y.S.3d 848, 851 (App. Div. 2018) finding that

6   documentary evidence submitted by an owner was insufficient to

7   establish as a matter of law on a motion to dismiss that the

8   defendant did not give consent to the improvements that gave

9   rise to the mechanic's lien.

10          The defendants argue that the description of the labor

11  and services in the notice of the lien itself makes clear that

12  the subject of the lien did not come within the ambit of

13  leasehold improvements that 3 BP Property consented to but

14  whether "the installation of foodservice equipment, including,

15  but not limited to ranges, hoods, walk-in refrigeration,

16  project management and coordination, etc." fell within the

17  scope of what 3 BP Property's implicitly consented to because

18  those installations were "permanent improvements" that would

19  inure to the benefit of 3 BP Property at the end of the lease

20  term cannot be determined based on the current papers and there

21  are factual issues in dispute that must await further

22  development in the case.

23          Similarly, the auction of Dadong's assets as part of

24  Dadong's bankruptcy proceedings is not necessarily conclusive

25  because it is not clear from the papers whether the items to be

1    auctioned bear any relation to the labor, services, and

2    equipment that is the subject of the mechanic's lien.

3         Because there are facts in dispute that cannot be

4    determined on this motion to dismiss, namely, whether the

5    unpaid portion of the labor, services, and equipment that is

6    the subject of the lien concerns tenant's property or leasehold

7    improvements, it is impossible to conclude that the allegations

8    in the complaint, taken as true, fail to state a cause of

9    action against the defendants.  The motion to dismiss the first

10   cause of action is denied.

11        Under New York Law, quantum meruit and unjust

12   enrichment can be analyzed together as one quasi-contract

13   claim.  Mergers & Acquisition Servs., Inc. v. Eli Glob., LLC,

14   No. 15-cv-3723, 2017 WL 1157132, at *14 (S.D.N.Y. Mar. 27,

15   2017).

16        To allege a claim for unjust enrichment, a plaintiff

17   must allege that "(1) the defendant was enriched, (2) at the

18   plaintiff's expense, and (3) that it is against equity and good

19   conscience to permit the defendant to retain what is sought to

20   be recovered." Id. (internal quotation marks omitted).

21        "A 'quasi contract' only applies in the absence of an

22   express agreement, and is not really a contract at all but,

23   rather, a legal obligation imposed in order to prevent a

24   party's unjust enrichment."  Clark-Fitzpatrick, Inc. v. Long

25   Island R. Co., 516 N.E.2d 190, 193 (N.Y. 1987).

1          Thus, "it is impermissible . . . to seek damages in an

2     action sounding in quasi contract where the suing party has

3     fully performed on a valid written agreement, the existence of

4     which is undisputed, and the scope of which clearly covers the

5     dispute between the parties."  Clark-Fitzpatrick, 516 N.E.2d at

6     193.

7          This is the case even when the plaintiff seeks to hold

8     a non-signatory to the contract liable in quasi-contract.  See

9     Air Atlanta Aero Engineering Ltd. v. SP Aircraft Owner I, LLC,

10    637 F. Supp. 2d 185, 196 (S.D.N.Y. 2009)

11         "A quasi-contractual claim against a third party must

12    be dismissed when an undisputedly valid and enforceable written

13    contract governs the same subject matter."  Mueller v. Michael

14    Janssen Gallery Pte. Ltd., 225 F. Supp. 3d 201, 207 (S.D.N.Y.

15    2016) (collecting cases).

16         In this case, the plaintiff alleges that 3 BP Property

17    and its surety, Westchester Fire, have been enriched due to the

18    work, labor, materials, and services provided to the premises

19    at the plaintiff's expense.

20         The plaintiff argues that neither of the two

21    defendants were parties to the contract entered into between

22    Dadong and the plaintiff but that the terms of the lease

23    between Dadong and the plaintiff, specifically Section 8.01,

24    make it clear that certain improvements would become part of

25    the landlord's property at the end of the lease.

1    Therefore, the plaintiff argues that improvements for

2  which the plaintiff remains unpaid have unjustly enriched the

3  defendants and that the plaintiff is owed payment by the

4  defendants in quasi-contract.

5    The defendants argue principally that the existence of

6  a written contract between Dadong and the plaintiff precludes

7  recovery in quasi-contract against the defendants.  The

8  defendants are correct.

9    The parties do not dispute that a valid contract was

10  entered into between the plaintiff and Dadong for work on the

11  premises and that the terms of that contract cover the subject

12  matter of the claim for unjust enrichment and quantum meruit

13  against the defendants.

14    The existence of that valid written contract governing

15  the subject matter of the quasi-contract claims bars the

16  plaintiff's recovery in quasi-contract, even against the

17  non-signatory defendants 3 BP Property and its surety,

18  Westchester Fire.

19    The plaintiff may not overcome this result by arguing

20  that it may plead a contract claim against Dadong and a

21  quasi-contract claim against the non-signatory defendants in

22  the alternative.  See LaRoss Partners, LLC v. Contact 911 Inc.,

23  874 F. Supp. 2d 147, 165-66 (E.D.N.Y. 2012).

24    Nor has the plaintiff provided any authority to

25  support recovery in quasi-contract against a non-signatory

 1    simply because the signatory has defaulted or is in bankruptcy.

 2         The motion to dismiss the quasi-contract claims is

 3    therefore granted.

 4         The Court has considered all of the arguments of the

 5    parties.  To the extent not discussed, the arguments are either

 6    moot of without merit.  The motion to dismiss the claim to

 7    foreclose the mechanic's lien, Count One, is denied.  The

 8    motion to dismiss the quasi-contract claims is granted.  The

 9    clerk is directed to close all pending motions.  So ordered.

10         All right.  So that disposes of the motion to dismiss.

11    The next phase, of course, as the parties have said, is

12    disclosure and discovery.  The parties should give me a

13    Rule 26(f) report by July 24.  If the report is otherwise

14    reasonable, I'll simply endorse it as the scheduling order.

15         You can get my regular scheduling order from

16    Mr. Fletcher, if you don't otherwise have it.  The Rule 26(f)

17    should include answers to the blank dates in my regular

18    scheduling order.

19         Would the parties agree to try this case before the

20    magistrate judge?

21         You don't have to answer now.  You can just let me

22    know after you've had your Rule 26(f).  There's a line on my

23    scheduling order which says you should get back to me by a date

24    certain with respect to whether you think that the assistance

25    of the magistrate judge for purposes of settlement would be

1   useful and whether you agree to trial before the magistrate

2   judge.  So you can just give me a date that you want to get

3   back to me on those issues.

4           Is there anything else that I can do for you today?

5           MR. JARED ROSEN:  No.  Thank you, your Honor.  Thank

6   you very much.

7           MR. GARY ROSEN:  Thank you, your Honor.  Gary Rosen.

8           THE COURT:  Great.

9           MR. HADDAD:  Your Honor, Mitchell Haddad.  Can I get a

10  copy of the transcript?  Can we order it?

11          THE COURT:  Yes.  You can get a transcript.  I'm sure

12  the court reporter will be delighted to provide you with a copy

13  of the transcript.  I'll sign off, and the court reporter can

14  give you the necessary details about how to order the

15  transcript directly from the court reporter.  Thank you, all.

16          (Adjourned)

17

18

19

20

21

22

23

24

25