UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————

BARING INDUSTRIES, INC.,

                              Plaintiff,            19-cv-2829 (JGK)

                                                   OPINION AND ORDER
        - against -

3 BP PROPERTY OWNER LLC, ET AL.,

                              Defendants.

————————————————————————————

JOHN G. KOELTL, District Judge:

    The plaintiff, Baring Industries, Inc. ("Baring"), brought
this action against 3 BP Property Owner LLC ("3 BP"), Dadong
Catering LLC ("DaDong"), Westchester Fire Insurance Company
("Westchester"), Done Right Hood & Fire Safety Inc. ("Done
Right"), and AA Jedson Company LLC ("AA Jedson"), seeking to
foreclose on a mechanics lien (the "Lien") against 3 Bryant Park
a/k/a 1095 Avenue of the Americas a/k/a 126-128 West 42nd Street
in Manhattan, New York (the "Property"). 3 BP brought
counterclaims for willful exaggeration of the Lien, wrongful
filing of the Lien, and injury to property.

    Baring moves for summary judgment pursuant to Federal Rule
of Civil Procedure 56 seeking to foreclose on the Lien and for
judgment on the bond that discharged the Lien (the "Bond").
Baring also moves for summary judgment dismissing 3 BP's three
counterclaims. 3BP and Westchester (together, the "Moving
Defendants") move for summary judgment dismissing Baring's

1

claims seeking foreclosure on the Lien and judgment on the Bond. The Moving Defendants also move for summary judgment granting 3 BP's counterclaim for willful exaggeration of the Lien and seek a declaration that the Lien is void and an award of damages to 3 BP.

For the following reasons, Baring's motion for summary judgment is **denied** and the Moving Defendants' motion for summary judgment is **granted**.

**I.**

The following facts are based on the parties' Local Civil Rule 56.1 statements and supporting papers and are undisputed unless otherwise noted.

**A.**

3 BP owns the Property. Pl.'s Counterstatement of Disputed Material Facts ¶ 1 (ECF No. 157, "P-CDMF"). In or around March 2016, 3 BP leased a portion of the Property to DaDong (the "Leased Property") pursuant to a retail lease agreement. See ECF No. 141-1 (the "Lease"); P-CDMF ¶ 2. The Lease required DaDong to construct a multi-floor restaurant in the Leased Property (defined in the Lease as the "Tenant's Initial Work"). P-CDMF ¶ 3; Lease § 3.03. Section 3.03 of the Lease obligated 3 BP to reimburse DaDong for up to $1.825 million of "actual construction" costs incurred in connection with the Tenant's Initial Work (defined in the Lease as the "Allowance"), provided

2

that DaDong submitted paid invoices, architect's certificates, and partial or final lien waivers to 3 BP. Lease § 3.03. DaDong was also entitled to reimbursement from the Allowance for so-called "soft costs" incurred in connection with the Tenant's Initial Work, such as architectural and engineering fees. Id. The Lease prohibited DaDong from applying any portion of the Allowance towards costs associated with DaDong's "portable equipment, furniture, or other items of personal property." Id.

The Lease provided that all "Leasehold Improvements" that DaDong made to the Leased Property must remain on the Leased Property at the end of lease term without compensation to DaDong. Lease § 8.01. However, DaDong was required to remove all "Tenant's Property" from the Leased Property upon termination of the Lease or DaDong's right to possession. Id. Art. 24. The Lease defined "Tenant's Property" as all "business and trade fixtures, equipment, movable partitions, furniture, merchandise, and other personal property within the" Leased Property. Id. Art. 14.

Baring is a commercial food service equipment contractor that, among other things, purchases, delivers, and installs food service equipment on behalf of its clients. Turner Tr. 8, 13. In October 2016, Baring submitted a written proposal to be DaDong's "Foodservice Equipment Contractor" in connection with DaDong's renovations of the Leased Property. ECF No. 142-2 at PLAINTIFF

0476 (the "Proposal"). The Proposal was based on kitchen and restaurant design specifications prepared by non-party Jacobs Doland Beer ("JDB"). Id.; P-CDMF ¶ 10. The "Scope of Work" in the Proposal provided that Baring would "supply, warehouse, deliver to the jobsite when ready, uncrate, assemble, set in place, level and secure to wall, where appliable, all items" specified by JDB. Proposal at PLAINTIFF 0479. The Proposal quoted a total project price of about $1.9 million, with over $1.4 million attributable to "equipment" and the remainder allocated to "freight, warehouse, delivery," "installation," and sales tax. Id. at PLAINTIFF 0476.

Michael Fitzgibbon, Baring's President, characterized the Proposal as an offer by Baring to purchase the food service equipment specified by JDB from third parties, arrange for delivery of the equipment, and have the equipment installed in the Leased Property. Fitzgibbon Tr. 11, 142-43. Fitzgibbon further testified that the Proposal did not contemplate Baring's scope of work to include any services related to utility connections, demolition, plumbing, or roof, wall, or floor penetrations. Id. at 145-49.

In the Spring of 2017, DaDong and Baring entered into an agreement entitled "AIA Document A151 – 2007 Standard Form of Agreement Between Owner and Vendor for Furniture, Furnishings and Equipment." ECF No. 142-7 (the "Agreement"); P-CDMF ¶ 15. It

4

is undisputed that the Agreement was an "agreement for the sale of goods" and is governed by the Uniform Commercial Code ("UCC"). P-CDMF ¶ 16. The Agreement required Baring to execute the work described in the "Contract Documents," which was defined to include, among other things, the Agreement, the Proposal, and any modifications. Agreement Art. 1. The Agreement could only be modified through a written modification signed by both parties or through a written order for a minor change issued by DaDong. P-CDMF ¶ 20. There is no evidence that the parties ever agreed to modify the Agreement orally. Id. ¶ 21. Pursuant to the Agreement and several subsequently executed change orders, Baring sold to DaDong a suite of food service equipment that included tables, counters, sinks, exhaust hoods, refrigerators, freezers, stoves, fryers, dishwashing equipment, fish tanks, woks, microwaves, and other items. See, e.g., Turner Tr. 122-31, 170-74.

    Also in 2017, DaDong engaged a general contractor to perform the Tenant's Initial Work. P-CDMF ¶ 7. DaDong later applied for reimbursements for this work from the Allowance by submitting paid invoices, architect's certificates, and partial or final lien waivers to 3 BP. Id. 3 BP reimbursed DaDong from the Allowance for certain of these invoices. Id. Michael McMahon, an authorized representative of 3 BP, declared that DaDong never sought reimbursement from 3 BP for any labor,

5

services, or materials supplied by Baring. ECF No. 141 ¶ 5

("McMahon Decl."). Baring disputes this and points to an invoice

to DaDong from JDB and a food service equipment specification

prepared by JDB for DaDong. P-CDMF ¶ 8; ECF Nos. 158-6, 158-21.

　　In or around February 2019, Baring filed the Lien against

the Property because DaDong allegedly failed to pay what Baring

claimed was an outstanding balance of $320,356.94 under the

Agreement. Id. ¶ 27. Fitzgibbon authorized Baring's Controller,

Jennifer Hendrick, to file the Lien. Id. ¶ 28. Hendrick then

provided the information contained in the Lien to NY Liens, a

third-party company, and instructed NY Liens to file the Lien on

behalf of Baring. Id. ¶ 30. Hendrick testified that $220,753.21

of the Lien amount was attributable to outstanding balances from

several change orders and that the remainder reflected the

retention balance under the Agreement. Id. ¶ 36. 3 BP argues

that the entire amount of the Lien is overstated because

Baring's work for DaDong did not result in "permanent

improvements" to the Leased Property. 3 BP also contends that

Baring overstated the Lien amount by $165,373.76, which 3 BP

argues is attributable to three change orders that were never

approved in writing by DaDong.

　　Baring's Notice Under Mechanic's Lien Law explained that

Baring furnished materials to DaDong consisting of "foodservice

equipment, hoods, walk-in refrigeration, etc.," and provided

DaDong with labor for the "installation of foodservice equipment including but not limited to, ranges, hoods, walk-in refrigeration, project management and coordination, etc." ECF No. 142-11 at PLAINTIFF 0369-70 (the "Lien Notice"); P-CDMF ¶ 31. The Lien Notice further provided that "said labor and materials were performed and furnished for and used to the improvements of the" Leased Property. Id.

   After 3 BP unsuccessfully attempted to discharge or bond the Lien, 3 BP terminated the Lease and commenced a summary holdover proceeding. P-CDMF ¶¶ 39-40. In September 2019, the New York City Civil Court awarded 3 BP judgment of possession, along with a money judgment and a warrant of eviction to recover possession of the Leased Property. Id. ¶ 41. The Lien was then bonded by Westchester and discharged as to 3 BP's real property. Pl.'s 56.1 Statement of Undisputed Material Facts ¶ 57 (ECF No. 151).

   In November 2019, DaDong filed a petition for relief under Chapter 11 of the Bankruptcy Code. P-CDMF ¶ 43. In December 2019, the Bankruptcy Court for the Southern District of New York approved a stipulation that allowed DaDong to sell at auction all its trade fixtures, equipment, and personalty, including the food service equipment that Baring sold to DaDong. Id. ¶ 44. The auction was held in January 2020 and a winning bid of $120,000 was accepted for the entire contents of the Leased Property.

Id.; see also ECF No. 142-25 at 3BP 001654-67 (asset purchase agreement listing the items sold at the bankruptcy auction).

A professional photographer took pictures of the Leased Property before and after the bankruptcy auction. See ECF No. 152 ("Morris Decl."); ECF Nos. 152-1 through 152-5 (the "Pre-Auction Photos"); ECF Nos. 152-6 through 152-10 (the "Post-Auction Photos"). A wide array of food service equipment is visible in the Pre-Auction Photos. The Post-Auction Photos appear to show that substantially all the food service equipment depicted in the Pre-Auction Photos was removed from the Leased Property sometime after the auction.

**B.**

On October 30, 2019, the Moving Defendants moved to dismiss all of Baring's claims against them. In a bench opinion dated July 13, 2020, the Court dismissed Baring's claims against the Moving Defendants for unjust enrichment and quantum meruit. See ECF No. 108 (the "MTD Order"). However, the Court denied the Moving Defendants' motion to dismiss with respect to Baring's claims seeking foreclosure on the Lien and judgment on the Bond, reasoning that whether Baring could maintain claims against the Moving Defendants arising out of the Lien turned on fact issues that could not be resolved on the motion to dismiss. In relevant part, the Court explained:

The Lease establishes that [3 BP] consented to some kinds of permanent improvements to the premises based on the fact that the Lease contemplated that Dadong would undertake initial work that would eventually inure to the benefit of [3 BP] following termination of the Lease. What is unclear from the second amended complaint and the papers submitted on this motion to dismiss is what is the precise nature of the unpaid labor, services, and equipment costs that are the subject of the [Lien] and whether all the improvements made that are subject to the unpaid portion of the contract between [Baring] and Dadong are rightly classified as "Leasehold Improvements" under the term of the Lease. Whether the unpaid money allegedly owed to [Baring] was for work done for permanent improvements, within the meaning of the Lien Law and the [Lease] or, instead, for property that would be removable by Dadong at the end of the Lease, could not be decided on the current papers.

MTD Order at 31-32.

## II.

The standard for granting summary judgment is well established. The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter or matters that "it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts which are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998).

### III.

The Moving Defendants move for summary judgment granting 3 BP's counterclaim for willful exaggeration of the Lien. Baring cross-moves for summary judgment dismissing 3 BP's counterclaim for willful exaggeration of the Lien.

Under New York Lien Law § 39, if a court finds that a lienor has willfully exaggerated the amount for which the lienor claims a mechanic's lien, the lien "shall be declared to be void and no recovery shall be had thereon." N.Y. Lien Law § 39. Additionally, if a lien is voided under this provision, the property owner is entitled to damages equal to the amount that the lien was exaggerated, along with the costs and attorney's fees associated with bonding and discharging the lien. Id. § 39-a. To succeed on a claim of willful exaggeration of a lien, the property owner must establish that: (1) a lien was filed; (2) the amount of the lien was exaggerated relative to the underlying claim; and (3) the exaggeration was willful and not due to honest mistake. GPK 31-19 LLC v. L & L Constr. Dev. Inc., No. 650533/2017, 2020 WL 1972234, at *8 (N.Y. Sup. Ct. Apr. 23, 2020); see also Strongback Corp. v. N.E.D. Cambridge Ave. Dev. Corp., 808 N.Y.S.2d 654, 656-57 (App. Div. 2006). A claim for willful exaggeration of a lien may be resolved against the lienor on a motion for summary judgment where "the evidence that the amount the lien was willfully exaggerated is conclusive."

11

Northe Grp. Inc. v. Spread NYC, LLC, 931 N.Y.S.2d 231, 231 (App.
Div. 2011); see also LMF-RS Contracting, Inc. v. Kaljic,
2 N.Y.S.3d 351, 352 (App. Div. 2015); Inter Metal Fabricators,
Inc. v. HRH Constr. LLC, 942 N.Y.S.2d 334, 335 (App. Div. 2012).

### A.

3 BP argues that Baring exaggerated the entire amount of
the Lien because Baring did not make any permanent improvements
to the Leased Property. Under the New York Lien Law, a
contractor may have a mechanics lien against a property only if
the contractor's work resulted in an "improvement" to the
property. N.Y. Lien Law § 3. In relevant part, the statute
defines "improvement" as "the demolition, erection, alteration
or repair of any structure upon, connected with, or beneath the
surface of, any real property and any work done upon such
property or materials furnished for its permanent improvement
. . ." Id. § 2 (emphasis added).

In determining whether a contractor's work resulted in a
permanent improvement to a property, New York courts consider
factors such as the intent and understanding of the parties
regarding the alleged permanent improvement, the nature of the
alleged permanent improvement, and the ease with which the
alleged permanent improvement could be removed from the
property. See, e.g., Trystate Mech., Inc. v. Macy's Retail
Holdings, Inc., 943 N.Y.S.2d 162, 164 (App. Div. 2012) ("Despite

the size, expense, and complexity of hoisting the [electricity generating appliance] to the top of the roof of the [property]," the contract between the parties "clearly established that the parties did not intend to make the [appliance] a 'permanent improvement' . . ."); Negvesky v. United Interior Res., Inc., 821 N.Y.S.2d 107, 108 (App. Div. 2006) (the "installation of modular workstations" did not result in a permanent improvement because the contractor "did not demolish, erect, or alter any structure, nor did it perform work or furnish materials for its permanent improvement"); 230 FA, LLC v. Kajo Associates, No. 104964/10, 2010 WL 2897836, at *2-3 (N.Y. Sup. Ct. July 12, 2010) (custom-made window shades that contractor installed were not permanent improvements because they were "affixed with brackets" to the property and could "easily be removed with a screwdriver."); see also 270 Greenwich St. Assocs. LLC v. Patrol and Guard Enters., Inc., No. 114163/09, 2010 WL 2754092, at *4 (N.Y. Sup. Ct. June 21, 2010) (explaining that a contractor's services constitute a "permanent improvement" when they "result in a lasting and continuing beneficial change in the character of the realty." (citing Chase Lincoln First Bank N.A. v. New York State Elec. & Gas Corp., 581 N.Y.S.2d 694, 696 (App. Div. 1992))).

The undisputed facts establish that Baring's work on the Leased Property did not result in any permanent improvements

13

within the meaning of the New York Lien Law. First, the parties clearly did not understand or intend for the Agreement to be one for the provision of permanent improvements. The Agreement is entitled in relevant part "Agreement Between Owner and Vendor for <u>Furniture, Furnishings and Equipment</u>" (emphasis added). Baring concedes that the Agreement was a contract for the "sale of goods" that was governed by the UCC, and not a contract for the provision of services related to the "demolition, erection, alteration or repair" of the Leased Property. <u>See</u> N.Y. Lien Law § 2; N.Y. U.C.C. § 2-105(1) ("'Goods' means all things (including specifically manufactured goods) which are movable at the time of identification to the contract for sale . . ."). This understanding of the Agreement is corroborated by the plain language of the scope of work described in the Proposal (which was incorporated into the Agreement), along with Fitzgibbon's testimony that Baring understood its obligations under the Agreement to include the sourcing and installation of kitchen equipment for DaDong and to exclude services such as demolition or plumbing.

Second, the undisputed evidence demonstrates that the work that Baring in fact performed relating to the Leased Property comprised the delivery and installation of removable, non-permanent equipment. Baring's Lien Law § 38 Response to Itemized Statement identifies the items that Baring sold to

DaDong and lists non-permanent equipment that could simply be picked up and removed from the Leased Property, such as fish tanks, carts, heat lamps, ice bins, microwaves, rice cookers, garbage cans, and other light, portable items. See ECF No. 142-29 (the "Section 38 Response"). At his deposition, James Turner, the Baring witness most familiar with Baring's work on the Leased Property, confirmed that many of the heavier items that Baring delivered and installed, such as ovens, fryers, sinks, chef's counters, and refrigerators, were freestanding and could be collected and taken away from the Leased Property. See, e.g., Turner Tr. 128-31, 170-72, 193-97. Turner further testified that other items had built-in wheels. Id.; see also id. at 153-56, 183-84. It is beyond reasonable dispute that kitchen equipment that can simply be wheeled out of a property are non-permanent additions.[1] See, e.g., Negvesky, 821 N.Y.S.2d at 108. Finally, Turner testified that although certain items were affixed or screwed into the walls of the Leased Property, those items could be unscrewed and removed and the resulting

---

[1] The cases relied on by Baring, such as Sherwin v. Benevolent & Protective Ord. of Elks, Brooklyn Lodge No. 22, 265 N.Y.S. 14 (N.Y. Sup. Ct. 1930), are inapposite. In Sherwin, the Court found that custom-made kitchen equipment constituted permanent improvements to a club house kitchen because "it was the intention of the parties that these fixtures were to remain as permanent equipment." Id. at 16-17. Here, by contrast, the evidence demonstrates that the parties did not intend for the equipment that Baring sold to DaDong, a non-permanent commercial tenant of the Leased Property, to remain permanently in the Leased Property.

damage to the Leased Property from the uninstallation would be minimal. Id. at 167-70.[2]

Third, after the bankruptcy auction, nearly all the equipment that Baring sold to DaDong and installed in the Leased Property was removed from the Leased Property.[3] This further demonstrates that the services provided by Baring did not "result in a lasting and continuing beneficial change in the character of" the Leased Property, but rather were "auxiliary[] and one step removed from the actual demolition or

---

[2] In support of its motion for summary judgment, Baring submitted a declaration from Turner in which Turner declared, among other things, that Baring's work resulted in permanent improvements to the Leased Property and that "it was the intent and understanding between Defendant 3 BP and Defendant Dadong, as stated in the lease, that [Baring's work] would be a permanent improvement." ECF No. 147 ¶¶ 27, 31. Legal conclusions contained in a declaration submitted in connection with a motion for summary judgment, such as Turner's contention that Baring's work resulted in "permanent improvements" to the Leased Property, are insufficient to create a genuine dispute of material fact. See, e.g., Nadel v. Shinseki, 57 F. Supp. 3d 288, 293 n.6 (S.D.N.Y. 2014) (discrediting "legal conclusions [and] conclusory allegations contained in" the plaintiff's declaration (citing Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001))). Moreover, this self-serving allegation is contradicted by Turner's own deposition testimony describing the equipment that Baring delivered and installed. See Brown, 257 F.3d at 252 (allegations in an "affidavit that contradicts [a witness's] own prior deposition testimony" may be disregarded on a motion for summary judgment); see also Turner Tr. 204. Additionally, Turner's allegations as to the intent and understanding of 3 BP and DaDong are conclusory, refuted by the record evidence, lacking in foundation, and concern matters about which Turner has no personal knowledge. See Mattera v. JPMorgan Chase Corp., 740 F. Supp. 2d 561, 570 (S.D.N.Y. 2010) (affidavits submitted in connection with a motion for summary judgment "must be admissible themselves or must contain evidence that will be presented in an admissible form at trial").

[3] The sole pieces of equipment that were left behind after the bankruptcy auction were items relating to a fire suppression system that Baring had installed in the Leased Property. However, these items appear to have been sold in the bankruptcy auction, see infra n.5, and Turner testified that they could be detached and removed from the Leased Property. Turner Tr. 176-78.

16

construction." See 270 Greenwich St. Assocs. LLC, 2010 WL
2754092, at *4.

Finally, the parties' performance under the Lease confirms
that Baring's services were not intended to and in fact did not
result in permanent improvements to the Leased Property. Under
the Lease, DaDong was entitled to seek reimbursement from the
Allowance for any costs incurred in connection with the "actual
construction" of the Leased Property but was prohibited from
seeking reimbursement for costs relating to its "portable
equipment, furniture, or other items of personal property."
Lease § 3.03. If DaDong understood the kitchen equipment
supplied and installed by Baring to constitute permanent
improvements to the Leased Property, then DaDong surely would
have applied to be reimbursed for these costs from the
Allowance, as it did for other construction and renovation
costs. However, the record evidence establishes that DaDong
never sought reimbursement from the Allowance for any labor,
services, or materials supplied by Baring.[4] Moreover, the Lease

---

[4] Michael McMahon, 3 BP's authorized representative, declared that DaDong
never sought reimbursement for any costs related to Baring's work. The Moving
Defendants represent that they "produced all back-up documentation concerning
DaDong's reimbursement applications" and that "Baring did not question Mr.
McMahon on this issue when [Baring] deposed him." ECF No. 162 at 9. For these
reasons, the speculation and legal arguments advanced by Turner is his
declaration suggesting that further discovery is needed on this issue (see
ECF No. 160 ¶¶ 9-11) are without merit. See Alphonse Hotel Corp. v. Tran, 828
F.3d 146, 151 (2d Cir. 2016); cf. Fed. R. Civ. P. 56(d).

After taking full discovery from 3 BP, Baring is unable to point to any
evidence that disputes McMahon's declaration. Baring's bald assertion that
DaDong did in fact seek reimbursement for services supplied by Baring is in

obligated DaDong to remove all its "business and trade fixtures, equipment, movable partitions, furniture, merchandise, and other personal property" from the Leased Property at the end of its occupancy and to leave behind any "Leasehold Improvements." Lease Art. 14. Consistent with these provisions, DaDong obtained approval from the bankruptcy court to sell all the equipment delivered and installed by Baring.[5] Additionally, there is no evidence that 3 BP objected to the bankruptcy sale or ever contended that the equipment sold by Baring belonged to 3 BP or constituted Leasehold Improvements.

In sum, the undisputed evidence establishes that (1) DaDong and Baring understood that Baring's work would not result in permanent improvements to the Leased Property; (2) the equipment that Baring delivered to and installed in the Leased Property was non-permanent; (3) nearly all the equipment was ultimately removed from the Leased Property; and (4) DaDong and 3 BP performed under the Lease in a manner consistent with the conclusion that Baring's work did not result in a permanent improvement to the Leased Property. Because none of Baring's

---

no way supported by the evidence cited by Baring and is therefore insufficient to create a genuine dispute of material fact. See P-CDMF ¶ 8; Hick v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) ("[C]onclusory allegations or denials" cannot create a genuine dispute of material fact).

[5] Although it appears that the auction winner did not remove certain items relating to a fire suppression system from the Leased Property, the auction inventory list shows that these items were in fact sold to the action winner in the bankruptcy auction. See, e.g., ECF No. 142-23 (listing five "Kitchen Hood Fire Suppression System[s]").

work resulted in permanent improvements to the Leased Property,
Baring was not entitled to a lien in any amount against the
Leased Property. Accordingly, Baring exaggerated the Lien by its
entire value.

## B.

3 BP argues alternatively that irrespective of whether
Baring's work resulted in any permanent improvements to the
Leased Property, Baring exaggerated the value of the Lien by
$165,373.76—the cost of three change orders that 3 BP contends
were never properly executed. It is undisputed that Baring only
produced <u>unsigned</u> versions of the three change orders during the
discovery period in this action, which closed in June 2021.
P-CDMF ¶ 37; ECF No. 123. It is further undisputed that to be
valid under the Agreement, the change orders needed to have been
signed by DaDong. However, on September 20, 2021, Baring
attached what it submits are fully signed versions of the three
change orders to its opposition to the Moving Defendants' motion
for summary judgment. <u>See</u> ECF Nos. 158-8, 158-9, 158-10. Baring
argues that the allegedly signed versions of the three change
orders should be accepted in the summary judgment record, while
the Moving Defendants argue that Baring should be precluded from
relying on them.

If a party fails to meet its discovery obligations, a
"district court has wide discretion to impose sanctions,

19

including severe sanctions, under Federal Rule of Civil

Procedure 37." Agence France Presse v. Morel, 293 F.R.D 682, 685

(S.D.N.Y. 2013) (quoting Design Strategy, Inc. v. Davis, 496

F.3d 284, 294 (2d Cir 2006)). Pursuant to Rule 37(c)(1), if a

party fails to produce Rule 26(a) or (e) information, the party

generally is not permitted to use that information unless the

failure was substantially justified or harmless. Id. In

considering whether to exclude evidence under this standard,

courts consider: (1) the party's explanation for its failure to

disclose; (2) the importance of the evidence; (3) the prejudice

suffered by the opposing party; and (4) the possibility of a

continuance. Id. The party that violates Rule 26 bears the

burden of showing that its violation was either substantially

justified or harmless. Id. (citing Ritchie Risk-Linked

Strategies Trading (Ireland), Ltd. v. Coventry First LLC, 280

F.R.D. 147, 159 (S.D.N.Y. 2012)).

     Baring plainly failed to meet its Rule 26 discovery

obligations. On September 21, 2020, the Moving Defendants served

on Baring a request for production seeking, among other things,

"all documents and communications concerning any agreements

between DaDong and Baring for Baring's performance of work,

labor or services, or provision of materials, to the Subject

Premises, including but not limited to, [the Agreement]" and all

"change orders and all modifications thereof." ECF No. 161 ¶ 3

("Haddad Decl."). On multiple occasions thereafter, counsel for the Moving Defendants made renewed requests that Baring produce all documents responsive to that request for production, along with other documents relating to any change orders. Id. ¶¶ 4-10. Although the allegedly signed change orders were clearly responsive to the Moving Defendants' requests, Baring failed to produce them until months after discovery closed when it filed its opposition to the Moving Defendants' motion.

Moreover, Baring's failure to comply with its discovery obligations was neither justified nor harmless. First, Baring offers no explanation for its failure to produce the allegedly signed change orders in a timely fashion. It describes its failure as an "oversight." ECF No. 156 at 21. However, Baring's "oversight" is inexcusable in view of the obvious relevance and responsiveness of these documents to the Moving Defendants' discovery requests, and counsel's repeated and specific requests that Baring comply with its discovery obligations. See Agence, 293 F.R.D. at 688 ("Rule 26 calls for voluntary disclosure, and while a party's failure to disclose information of its own accord might be excused as a mere oversight, Plaintiff's failure to do so in response to Defendant's specific requests suggest both greater prejudice to Defendants and greater culpability on Plaintiff's part.").

Second, the Moving Defendants would be prejudiced if the allegedly signed change orders were not excluded. Baring's counsel and witnesses represented to the Moving Defendants that all documents responsive to the Moving Defendants' discovery requests were produced. See Haddad Decl. ¶¶ 11-13; Fitzgibbons Tr. 185 ("Q: Do you know whether the documents that Baring produced in this litigation are all of the documents in its possession, custody and control that are responsive to defendants' document request? A: To my knowledge we produced all the documents that were requested."). The Moving Defendants reasonably relied on these representations in formulating their litigation strategy and moving for summary judgment in part on the basis that, as far as they knew, the three change orders at issue were never properly executed. See Haddad Decl. ¶ 13.

Additionally, there are apparent unexplained inconsistencies between the unsigned change orders and the allegedly signed change orders.[6] Accordingly, if the documents were not excluded, discovery would need to be reopened months after it closed to afford the Moving Defendants an opportunity to investigate the authenticity of the untimely produced

---

[6] For example, the allegedly signed version of change order 13 is dated August 21, 2017 and shows a revised contract amount of $1,941,269.48. The unsigned version of change order 13 (which Baring appended to its Section 38 Response) is dated October 4, 2017 and shows a revised contract amount of $1,940,125.07. Compare ECF No. 158-7 at PLAINTIFF 0023 (unsigned change order), with ECF No. 158-8 (allegedly signed change order).

documents. The additional costs associated with a supplemental discovery period after discovery has closed and cross-motions for summary judgment have been fully briefed would prejudice the Moving Defendants. See, e.g., Atlantis Info. Techs., GmbH v. CA, Inc., No. 06-cv-3921, 2011 WL 4543252, at *13 (E.D.N.Y. Sept. 28, 2011) (the plaintiff "would be prejudiced by having to meet [the untimely] evidence at this late stage"); Pal v. N.Y. Univ., No. 06-cv-5892, 2008 WL 2627614, at *5 (S.D.N.Y. June 30, 2008) (party would suffer prejudice if untimely discovery were not excluded because "discovery would have to be reopened," which "would not only further delay this almost-two-year-old-case, but would impose further litigation costs on [the party]").

Third, although a continuance is theoretically possible, the fact that discovery closed months ago "weighs strongly against the possibility of a continuance." See Spotnana, Inc. v. Am. Talent Agency, Inc., 09-cv-3698, 2010 WL 3341837, at *2 (S.D.N.Y. Aug. 17, 2010).

In view of these considerations, the allegedly signed change orders should be excluded despite their importance to Baring's claims. See, e.g., Spotnana, 2010 WL 3341837, at *2 (the other "factors outweigh the importance of [the party's] damages evidence, even though [the party] may be denied any recovery as a result, because [the party] has disregarded its discovery obligation without any explanation at all"); Rienzi &

<u>Sons, Inc. v. N. Puglisi & F. Industria Paste Alientari S.P.A.</u>,
No. 08-cv-2540, 2011 WL 1239867, at *5 (E.D.N.Y. Mar. 30, 2011)
(excluding untimely produced evidence despite the importance of
the evidence; collecting cases imposing similar sanctions).

For these reasons, the allegedly signed change orders are
excluded from the summary judgment record. On the record
properly before the Court, it is undisputed that change orders
valued at $165,373.76 were never executed in accordance with the
Agreement. Despite this, Baring included this sum in the value
of the Lien. Accordingly, in addition to the fact that the
Moving Defendants have shown that Baring exaggerated the Lien by
seeking recovery for goods and services that were not permanent
improvements, the Moving Defendants have also shown that Baring
exaggerated the Lien by $165,373.76, more than half the total
value of the Lien.

### c.

3 BP contends that because there is also conclusive
evidence Baring exaggerated the Lien willfully, 3 BP is entitled
to summary judgment granting its willful exaggeration
counterclaim.

To demonstrate that Baring's exaggeration of the Lien was
willful, 3 BP must show that there was a "deliberate and
intentional exaggeration of the lien amount" by Baring, "rather
than merely a genuine mistake or disagreement concerning the

24

terms of the contract." See Pelc v. Berg, 893 N.Y.S.2d 404, 405
(App. Div. 2009); see also LMF-RS, 2 N.Y.S.3d at 352 (affirming
finding of willful exaggeration on summary judgment where the
"Plaintiff included in its lien amount items that [were] not for
labor or materials . . . and [the] plaintiff has failed to even
attempt to explain the discrepancies"); Northe, 931 N.Y.S.2d at
231 (affirming finding of willful exaggeration on summary
judgment where the "plaintiff's invoices" and the "parties
written agreement[] demonstrates conclusively that [the]
plaintiff" was not authorized to impose markups that were
included in the lien).

The undisputed evidence conclusively establishes that
Baring willfully overstated the value of the Lien. Notably, the
Baring witnesses involved with the preparation and filing of the
Lien disclaimed knowledge of the work that Baring did yet caused
the Lien to be filed anyway. Fitzgibbon testified that he was
not familiar with the "details of the project" and that he
lacked knowledge about the equipment that Baring sold to DaDong.
Fitzgibbon Tr. 90-91, 187-88.[7] Despite Fitzgibbon's admitted lack

---

[7] See also id. at 25("Q: Do you have knowledge regarding Baring's performance
of and details concerning the work that is the subject matter of the lien? A:
No, I'm not detailed – I don't have detailed information on that."), 188 (Q:
"[S]o you can't testify about any particular item that was installed in
DaDong's former leased premises, correct? A: That would be Jim Turner. Q:
Okay. But not you? A: That's correct. I wasn't there."). Baring now submits a
declaration from Fitzgibbon in which he directly contradicts his deposition
testimony. ECF No. 149 ¶ 19 ("I am thoroughly knowledgeable about Plaintiff's
performances in the [Agreement], the details concerning the Project . . .
Plaintiff's itemized statements detailing the work that Plaintiff performed

of knowledge, he authorized Henrick to cause the Lien to be filed. Id. at 69-70. Fitzgibbon also signed and verified Baring's Section 38 Response, which listed the equipment that Baring sold to DaDong. ECF No. 142-29 at 4-5 (Fitzgibbon affirming that he read the document and "knows the contents thereof"). Although the three unsigned change orders were appended to the Section 38 Response, id. at 169, 173, 179, Fitzgibbon testified that he did not recall ever having seen any of the change orders and that he did not personally do anything to verify the amounts that Baring contended it was due under the Lien. Fitzgibbon Tr. 40-46.

Hendrick likewise lacked knowledge about Baring's work. Hendrick testified that she had never set foot in the Leased Property and that she lacked personal knowledge regarding the labor, equipment, and services that Baring provided to DaDong. Hendrick Tr. 38-39, 86-87, 90. Hendrick did know that that a mechanic's lien can only be filed in connection with a permanent improvement to property and that the Agreement could only be modified through a written, signed modification. Id. at 99-100,

---

for Defendant Dadong . . . as well as the amounts outstanding and unpaid by Defendant Dadong and the [Lien]."). Baring has not provided any explanation as to how this conflicting testimony can be reconciled. Accordingly, the allegation in paragraph 19 of Fitzgibbon's declaration cannot create a genuine dispute of fact. See In re Fosomax Products Liab. Litig., 707 F.3d 189, 193 (2d Cir. 2013) (a party may not defeat "summary judgment simply by submitting an affidavit that contradicts the party's previous sworn statements.")

115-16. Despite her knowledge of these requirements and her
unfamiliarity with Baring's work, she caused NY Liens to file
the Lien.

Had either Fitzgibbon or Hendrick attempted to verify
whether the Lien was well founded before they caused it to be
filed, they would have discovered that the equipment that Baring
delivered and installed could not reasonably have been
considered permanent improvements to the Leased Property.[8] See
supra Section III.A. Indeed, the record evidence demonstrates
that Baring, through at least Turner, must have known that its
work did not result in permanent improvements to the Leased
Property at the time that Baring entered into the Agreement and
when it filed the Lien. Id.; see also Turner Tr. 131-32. Despite
this, Baring filed the Lien and overstated it by its entire
amount. On this record, such a dramatic overstatement cannot
reasonably have been the result of a genuine mistake or
misunderstanding. To the contrary, given what Baring knew at the
time it filed the Lien, the evidence conclusively establishes
that Baring's exaggeration of the Lien was intentional and
deliberate.

---

[8] Additionally, had the Baring personnel responsible for the Lien reviewed the
materials filed in connection with the Lien, including the Section 38
Response, they would have discovered that the Lien was based in part on three
unsigned change orders.

Accordingly, Baring's motion for summary judgment dismissing 3 BP's counterclaim for willful exaggeration of the Lien is **denied** and the Moving Defendants' motion for summary judgment granting 3 BP's counterclaim for willful exaggeration of the Lien is **granted.**

**D.**

Because Baring willfully exaggerated the Lien, 3 BP is entitled to a declaration that the Lien is void. N.Y. Lien Law § 39. Moreover, because Baring overstated the Lien by its entire amount, 3 BP is entitled to damages equal to the value of the Lien, $320,356.94. Id. § 39-a. Additionally, Baring should be awarded "the amount of any premium for a bond given to obtain the discharge of the lien or the interest on any money deposited for the purpose of discharging the lien" and "reasonable attorney's fees for services in securing the discharge of the lien." Id.; see also Pelc, 893 N.Y.S.2d at 406. The amount of these damages cannot be determined on this summary judgment record. Accordingly, 3 BP may submit a supplemental motion for summary judgment for a sum of damages in excess of $320,356.94, along with a Rule 56.1 Statement and any necessary declarations and supporting evidence.

**IV.**

The Moving Defendants also move for summary judgment dismissing Baring's claims seeking foreclosure on the Lien and

28

judgment on the Bond. Baring cross-moves for summary judgment seeking foreclosure of the Lien and judgment on the Bond. However, because the Lien is void on account of Baring's willful exaggeration, Baring cannot maintain any claims arising out of the Lien.

In any event, Baring's claims arising out of the Lien are without merit. To assert a mechanic's lien against a property, the lienor must establish that the contractor made a permanent improvement to a property and did so "with the consent or at the request of the owner thereof . . ." N.Y. Lien Law §§ 2, 3.

Baring's claims fail because its work did not result in any permanent improvements to the Leased Property. See supra Section III.A. For this same reason, the undisputed evidence demonstrates that 3 BP did not consent to Baring's work. To establish consent, Baring must show that 3 BP was either an "affirmative factor in procuring the improvement to be made, or having possession and control of the premises[,] assent[ed] to the improvement in the expectation that" Baring would reap the benefit of it. See Ferrara v. Peaches Café LLC, 115 N.E.3d 621, 624 (N.Y. 2018). In the MTD Order, the Court explained that Baring alleged adequately that 3 BP had consented to Baring's work on the Leased Property, but only to the extent that Baring's work resulted in permanent improvements to the Leased Property and fell under the ambit of the Allowance provisions of

Section 3.03 of the Lease. See MTD Order at 28-32. Now that discovery has closed and the fully developed record is before the Court, it is clear that none of Baring's work resulted in permanent improvements and that DaDong was never reimbursed for Baring's work under Section 3.03 of the Lease. See supra Section III.A. Accordingly, 3 BP did not consent to Baring's work on the Leased Property and Baring's claims arising out of the Lien against 3 BP and its surety, Westchester, fail.

For these reasons, the Moving Defendants' motion for summary judgment dismissing Baring's claims seeking foreclosure on the Lien and judgment on the Bond is **granted.** Baring's motion for summary judgment seeking foreclosure on the Lien and judgment on the Bond is **denied.**

**V.**

Baring moves for summary judgment dismissing 3 BP's counterclaims for wrongful filing of the Lien and injury to property. Baring's sole argument as to why these claims should be dismissed is that Baring "rightfully filed the Lien in accordance with the New York Lien Law." ECF No. 146 at 18. This argument fails in view of the conclusions reached above. Accordingly, Baring's motion for summary judgment dismissing 3 BP's counterclaims for wrongful filing of the Lien and injury to property is **denied.**

**VI.**

In its second amended complaint ("SAC," ECF No. 64), Baring
alleged that it named AA Jedson and Done Right as defendants
because each entity had "filed a notice of mechanic's lien in
the office of New York County Clerk against the" Property. Id.
¶¶ 16-17. The SAC did not specifically assert any claims against
AA Jedson or Done Right.

Baring filed an affidavit of service as to AA Jedson on
October 28, 2019. AA Jedson has not yet filed an answer or
appeared in this action. Although the Clerk issued a certificate
of default as to AA Jedson on November 13, 2019, Baring has not
sought a default judgment against AA Jedson. In any event, the
Lien is void and neither Baring nor any other party has advanced
any claims against AA Jedson. Accordingly, there is no case or
controversy between AA Jedson and any party to this action, and
any claims by any party against AA Jedson are **dismissed.**

On July 27, 2020, 3 BP filed a crossclaim against Done
Right. 3 BP alleged that Done Right had filed a mechanics lien
against the Property and that 3 BP had the lien bonded by
Westchester. ECF No. 92 ¶¶ 189-92. 3 BP sought a declaration
that because Done Right had not yet appeared in the action, Done
Right had waived its right to enforce the lien against 3 BP and
Westchester. Id. ¶ 199. Done Right subsequently appeared,
answered, and filed a crossclaim against 3 BP on November 4,

2020, seeking to foreclose on Done Right's lien against the Property. See ECF No. 118 ¶¶ 170-76. On July 8, 2021, the Court so-ordered stipulations filed by Done Right and 3 BP that dismissed the parties' crossclaims with prejudice and released Done Right's lien against the Property. ECF Nos. 131, 132. In a letter to the Court dated July 7, 2021, Baring indicated that it did not oppose dismissing Done Right from this action. ECF No. 130. Accordingly, all claims against Done Right are **dismissed.**

On November 27, 2019, Baring filed a Suggestion of Bankruptcy as to DaDong and acknowledged that this action was automatically stayed with respect to DaDong pursuant to 11 U.S.C. § 362(a)(1). ECF No. 83. The stay has not yet been lifted. Baring is directed to file a status report updating the Court as to the state of DaDong's bankruptcy proceedings by February 4, 2022.

## CONCLUSION

The Court has considered all of the arguments of the parties. To the extent not discussed above, the arguments are either moot or without merit.

For the foregoing reasons, the Moving Defendants' motion for summary judgment **granted.** Baring's motion for summary judgment is **denied.** The Lien is declared void as willfully exaggerated. All claims against AA Jedson and Done Right are **dismissed.**

3 BP may submit a submit a supplemental motion for summary judgment for a sum of damages in excess of $320,356.94, along with a Rule 56.1 Statement and any necessary declarations and supporting evidence, by February 4, 2022. Baring's opposition, if any, is due by February 28, 2022. Any opposition should be accompanied by a response to 3 BP's Rule 56.1 Statement and any necessary declarations and supporting evidence. 3 BP's reply is due by March 11, 2022.

Baring is directed to file a status report updating the Court as to the state of DaDong's bankruptcy proceedings by February 4, 2022.

The Clerk is directed to terminate AA Jedson and Done Right as parties in this action. The Clerk is further directed to close Docket Nos. 138, 145, and 163.

SO ORDERED.

Dated:   New York, New York
         January /5/, 2022

_____
          John G. Koeltl
    United States District Judge